UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

UNITED STATES OF AMERICA,

      v.

SHAUNIQUA RODRIGUEZ,

                Defendant.

**DECISION AND ORDER**
18-CR-49-RJA

─────────────────────────────

      Pending before the Court is Defendant Shauniqua Rodriguez's motion (Dkt. No. 423) for an expedited hearing and motion for bail pending her Second Circuit appeal of the Court's Decision and Order denying Defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and as amended by the First Step Act.[1]  The Court has also considered all other filings made by the parties in relation to this motion. (*See* Dkt. Nos. 426, 427, 429, 431, 432, 433).  For the reasons stated below, the Court denies Defendant's motion for bail pending appeal.

      However, the Court inquired whether Defendant is asking the Court to construe her bail motion instead as a new compassionate release motion and thereby seeking an indicative ruling on said motion.  Defendant responds in the affirmative. (Dkt. No. 431, ¶ 15).  The Government opposes any new compassionate release motion. (*See* Dkt. No. 433, p. 3).  The Court hereby determines that Defendant's motion for bail pending appeal is actually a new/ renewed motion for compassionate release based on changed

─────────────────────────────

[1] The appeal is consolidated.  The Court previously denied by Text Order Defendant's motion as it relates to her appeal from her judgment of conviction.  *See* Dkt. No. 375 (Judgment); Dkt. No. 424 (Text Order).

circumstances, and issues this indicative ruling that it would grant the motion if the Second Circuit remands the case for that purpose. *See* Fed. R. Crim. P. 37(a)(3).

## DISCUSSION

The Court assumes the parties' familiarity with the prior proceedings, the pending motion, and the arguments that have been raised. The Court refers to those proceedings and its rulings only as is necessary to explain the reasoning that follows.

**I.     Motion for Bail Pending Appeal**

Under 18 U.S.C. § 3143(b)(1), the court "shall order" detention in the absence of a finding by clear and convincing evidence that: (1) the defendant does not pose a risk of flight or a danger to others; (2) the "appeal is not for the purpose of delay"; and (3) the appeal presents "a substantial question of law or fact likely to result in" a reversal, an order for a new trial or no imprisonment beyond time already served. *See United States v. Taubman*, 297 F.3d 161, 166-167 (2d Cir. 2002). The burden of proof rests on the defendant in motions for bail pending appeal. Fed. R. Crim. P. 46(c).

The Court concludes that Defendant has not met this burden relative to the Court's previous denial of Defendant's motion for compassionate release. (Dkt. No. 411). Defendant argues in conclusory terms, tracking the language of the statute,

> "Release on conditions now is appropriate, pursuant to 18 U.S. Code § 3143(b)(1). Ms. Rodriguez has now served more than 6 1/2 months of her 12 months [sic] sentence, is not likely to flee or pose a danger to the safety of any other person or the community, her appeal is not for the purpose of delay and raises substantial questions of law or fact likely to result in reversal or a reduced sentence to a time of imprisonment less than the total time already served plus the expected duration of the appeal process."

(Dkt. No. 423-1, ¶ 16 [emphasis in original]).

Indeed, Defendant's bail motion is more properly construed as a new/ renewed motion for compassionate release, based on changed circumstances and documentation that was lacking in Defendant's original motion.

## II.     Renewed Compassionate Release Motion[2]

The first basis for treating Defendant's bail motion as a second or renewed motion for compassionate release is that she is no longer housed at the Northeast Ohio Correctional Center ("NEOCC") in Youngstown, Ohio, run by CoreCivic.  Shortly after Defendant's bail motion was filed in this Court, defense counsel was notified that Defendant had been transferred to a new, private facility, i.e. CoreCivic's Cimarron Detention Center in Cushing, Oklahoma, and then informed the Government of that development and that Defendant was in quarantine and at least part of the facility was in lockdown.  (*See* Dkt. No. 426, ¶ 3; Dkt. No. 427, ¶¶ 4-5, 7).  The Bureau of Prisons ("BOP") Inmate Locator confirms that Defendant is still not in BOP custody and her release date remains July 10, 2021.  *See* "Inmate Locator", Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Mar. 1, 2021).

The Court explicitly and repeatedly asked the Government to set forth the evidence or arguments raised in the motion for bail pending appeal that were not raised in Defendant's original motion for compassionate release, to assist the Court in determining whether an indicative ruling on a renewed motion for compassionate would be appropriate.  (*See* Dkt. Nos. 425, 428).  The Government's first response indicated

---

[2] The Court refers to its prior Decision and Order on Defendant's original compassionate release motion (Dkt. No. 411) for purposes of setting forth the general standards on a motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  The only factors at issue are whether Defendant has met her burden of establishing (1) extraordinary and compelling circumstances for a sentence reduction and (2) that the 18 U.S.C. § 3553(a) factors weigh in favor of release and Defendant does not present a danger to others and the community.

3

its position that Defendant's motion for bail pending her appeal was "primarily based on the same arguments she raised in her compassionate release motion".  (Dkt. No. 429, p. 2).  In the event the Government misconstrued the Court's directives, the Court again instructed, and even more explicitly, the Government to identify these differences, and to comply with its prior Text Orders including to supply pertinent COVID-19 related information about the facility Defendant had recently been transferred to.  (Dkt. No. 430).  This information, certainly important to the Court's analysis of the motion, includes details such as the facility's COVID-19 precautions, infection rates (in comparison to the total facility population), and availability of COVID-19 treatment and vaccines, which the Government admitted "should be presented to the Court before ruling on the defendant's motion."  (Dkt. No. 426, ¶ 3).

The Government's response to the Court's Text Order clarification was filed on February 19, 2021, but past the 9:00 a.m. deadline as mandated by the Court.  It simply summarizes each of Defendant's prior filings of her original motion for compassionate release and argues that documentation submitted with Defendant's Second Circuit appeal regarding her body measurements and vital signs fails to corroborate "her claims about her asthmatic condition".  The Government acknowledges that those records "confirm her obesity status" but argues that for purposes of Defendant's motion for bail pending appeal she failed to establish she does not pose a risk of danger upon release.  (Dkt. No. 432, pp. 1-5).  Moreover, the Government outlined its repeated efforts to obtain information about the COVID-19 situation at Defendant's current facility, to no avail.  (Dkt. No. 432, pp. 5-6).

The Court finds that the Government's filing was again unresponsive to the Court's Text Order directives.

On February 24, 2021, the Government filed a sur-reply as approved in the Court's original Text Order. This sur-reply provided supplemental information regarding the COVID-19 situation at Cimarron Detention Center, outlining what was conveyed by a representative of the facility when communication with the Government was finally established on February 23, 2021. The Government relays that the facility is generally "adhering to protocols consistent with guidance issued by the Centers for Disease Control", such as issuing masks to staff and inmates and enforcing social distancing. Cimarron Detention Center's representative also stated that "as of February 23, 2021, Cimarron has 29 inmates and one staff member who have tested positive for COVID-19", and a second staff member is in precautionary quarantine. It is unclear from this statement whether these numbers represent the inmates and staff who currently have COVID-19, or if they are the total who have tested positive to date.

While the Government appears to have made diligent efforts to obtain information about Cimarron Detention Center, it is certainly concerning to the Court that those repeated efforts went unanswered for so long. Again, the Court sought this COVID-19 related information about Defendant's current facility to better assess that situation and the alleged risk to Defendant's health during a worldwide pandemic. Even when information from the facility was provided, it was generic and did not put the numbers in context, *e.g.* how many inmates are housed at the facility and how many have been infected. It also failed to address whether any COVID-19 treatments are available to inmates or whether vaccines are being administered there.

In any event, Defendant's motion (Dkt. No. 423) differs from her original motion in that (1) as stated above, Defendant is no longer housed at NEOCC, but is now at Cimarron Detention Center; (2) she supplies documentation of her medical conditions that allegedly place her at a high-risk of severe illness or complications should she contract COVID-19; (3) her medical records show, in addition to her previously-claimed conditions of prior gastric bypass surgery, asthma, and obesity, that Defendant is also a former smoker; and (4) she provides additional, specific information regarding her proposed release plan.  (*Compare* Dkt. No. 411 *with* Dkt. Nos. 423, 427, 431).

### *Extraordinary and Compelling Circumstances*

With respect to Defendant's medical issues, the documentation attached to Defendant's motion confirms that Defendant underwent gastric bypass surgery in January 2017, after weighing in at 353.4 pounds (Body Mass Index ["BMI"] of 52.2).[3] Defendant reported having lost over 100 pounds in the year or two following the surgery (originally weighing 425 pounds and later, 247 pounds), but she began to regain the weight.  Her most recent measurement was taken on December 2, 2020, at 307 pounds and a BMI of 46.7.[4]  Thus, Defendant has shown that she has "severe obesity" (BMI of 40 or higher), which is a condition placing her at an increased risk of severe illness from

---

[3] Records differ whether Defendant is 68 inches (5 feet 8 inches) or 69 inches (5 feet 9 inches) tall. Because Defendant reported she was 5 feet 8 inches in her presentence investigation report (Dkt. No. 365, p. 2) and most records indicate that height, the Court will use 5 feet 8 inches for the purpose of these calculations of Defendant's BMI.

[4] *See* "Healthy Weight, Nutrition, and Physical Activity:  Adult BMI Calculator", Centers for Disease Control and Prevention,
https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Mar. 1, 2021).

6

the virus that causes COVID-19.[5]  The Centers for Disease Control and Prevention ("CDC") states that "[a]s BMI increases, the risk of death from COVID-19 increases."[6]

In addition, Defendant did not argue in her original motion that she was a smoker, but the CDC has since added that to its list of high-risk underlying medical conditions ("[b]eing a current or former cigarette smoker").[7]  Defendant's medical records repeatedly note that she was a former, and then current, heavy cigarette smoker who smoked 21-30 cigarettes, or a half a pack, per day.  As such, Defendant has at least two high-risk medical conditions in connection with the virus.  The CDC states, "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[8]

In contrast, the Court cannot conclude on this record that Defendant's asthma qualifies as the "moderate-to-severe" asthma the CDC has identified as a condition that "might" pose an increase risk to individuals who are infected with the virus.[9]  Defendant has generally taken one inhaler daily and has been issued another "as needed".  The follow notations used to describe her asthma support the inference that her asthma is mild:  "acute asthma exacerbation", "[h]as history of asthma but only bothers her when she gets a cold", "mild intermittent asthma without complication", and "stable" asthma.

---

[5] *See* "COVID-19:  People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 22, 2021).

[6] *See* "Obesity, Race/Ethnicity, and COVID-19", Centers for Disease Control and Prevention, https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (last visited Mar. 1, 2021).

[7] *See* "COVID-19:  People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 22, 2021).

[8] *Id.*

[9] *Id.*

7

The only notation of a complication as a result of her asthma is "asthma exacerbation" in 2004, "hospitalization/ major diagnostic procedure", which is not elaborated upon.

As to Defendant's conditions of confinement, Defendant generally flags the recent escalation of prison positivity rates and the risk of contracting COVID-19 in prison as compared with the general United States population.  She also argues a reduction in sentence will significantly reduce the likelihood that she will contract COVID-19 or one of the highly contagious variants that are now circulating the United States.  According to the parties, CoreCivic's website provides no information about the availability of COVID-19 treatment or vaccines at Cimarron Detention Center, and as outlined above the facility has not provided that information to the Government.  Defendant informs the Court that neither treatment nor vaccines were available at NEOCC.

According to Defendant, she was initially placed on quarantine with her one cell mate when she arrived at Cimarron Detention Center and was advised that women in the other half of her pod had tested positive for COVID-19 and were on lockdown. Defendant and her cell mate alternated shifts in the common pod area with the COVID-19-positive women and were thereby potentially exposed to COVID-19.  She also alleges that although she was provided her asthma medication, as of February 18, 2021 no vaccine had been offered to her and she had not been seen by medical staff.  She was apparently told that, unlike at NEOCC, no notices of COVID-19 positive cases are circulated, and she was not provided a mask, hand sanitizer, or cleanser (just "one small bar of soap").  She has been using the mask she was giving at NEOCC.

On February 18, 2021, Defendant apparently exited quarantine and is now living in a pod with 132 women, some who are confined to their cells due to positive COVID-

8

19 tests.  Defendant alleges that conditions are more crowded at Cimarron Detention Center than at NEOCC, where she was in a pod with 52 women.  Defendant has provided exhibits that consist of a general report showing current COVID-19 cases at all United States Marshals Service contract facilities as of February 11, 2021 (with no breakdown per facility), documentation regarding the United States House of Representatives Judiciary Committee's inability to obtain detailed information regarding COVID-19 cases at these facilities, and CoreCivic releases and Oklahoma news reports.  (*See* Dkt. No. 431, ¶¶12-13 and Dkt. Nos. 431-1, 431-2, and 431-3).  CoreCivic's "Weekly COVID-19 Updates" indicate that as of the week of January 31, 2021, over 3,300 COVID-19 vaccines had been administered across 20 of its facilities located in 10 states.  Neither Oklahoma nor Cimarron Detention Center are mentioned in these vaccination updates.  (*See* Dkt. No. 431-3, pp. 14-16).

The Court concludes that, unlike Defendant's original motion for compassionate release, she has now demonstrated extraordinary and compelling reasons for a sentence reduction due to her documented medical conditions in the context of the pandemic, and the unrefuted, albeit limited, information about the COVID-19 situation at her current facility.

### *18 U.S.C. § 3553(a) Factors and Dangerousness*

The Government maintains its position that Defendant "has an abysmal track record while on release which accumulated four bail violations involving alcohol and an arrest for driving while intoxicated."  (Dkt. No. 429, p. 2).  The Government also argues that the hardships Defendant's children are facing "create an elevated concern that if she were released, she would continue to struggle with her untreated condition of

9

alcoholism, resulting in another violation of even the most stringent of bail conditions." (Dkt. No. 429, p. 3).

To be sure, the Court remains concerned about Defendant's history of prior violations of release conditions and her criminal history and does not alter its previously stated position about Defendant's offense conduct.

However, it has become increasingly clear that Defendant will not likely receive the Court-recommended mental health and substance abuse treatment because she is still housed at a private facility and not in BOP custody. The special conditions of supervision imposed by the Court include Defendant participating in programs for substance abuse and mental health treatment. (*See* Dkt. Nos. 375 [Judgment], 405 [Sentencing Tr., 07/24/2020]). Thus, Defendant will receive the support she needs for her issues with alcohol and mental health if the Court reduces Defendant's sentence to time served and converts the remainder of her sentence of incarceration to a term of supervised release, to be served on home confinement. Moreover, if Defendant is placed on home incarceration she will not be allowed to drive (or her driving will be significantly curbed), thereby reducing the likelihood that she will repeat any alcohol-related driving offenses.

Defendant has also provided an update concerning her children, who she argues continue to struggle in school amidst the pandemic. At least two of her children have been living in what she describes as unstable situations at various friends' houses. (Dkt. No. 427, ¶ 6). Defendant's family situation was considered by the Court in imposing a sentence at the low end of the applicable Guidelines range (Dkt. No. 405, p. 25), and thus will not serve as a significant factor in its determination here.

However, in contrast with Defendant's original motion, Defendant currently presents a more comprehensive release plan that includes working from home for Top Priority Transportation as a dispatcher and appointment facilitator, arranging transportation for medical appointments for Fidelis and Medicaid patients/ subscribers. Defendant's mother, Doreen Rodriguez, will assist Defendant with her living arrangements and both her sister-in-law in Lockport and friend, Jennifer Ribbick, in Gasport, will take her in immediately while she arranges for a new apartment. A work connection can assist Defendant in obtaining an available apartment in the Sheridan Park area of Tonawanda, New York. (Dkt. No. 423-1, ¶ 19; Dkt. No. 427, ¶¶ 7-8).[10]

In sum, the fact that Defendant has now served over half of her sentence, coupled with the severe risk to her health and safety should she contract COVID-19, weighs in favor of release. The Court finds that the § 3553(a) factors do not outweigh the extraordinary and compelling circumstances presented here, and that compassionate release would not "undermine the goals of the original sentence". *United States v. Ebbers*, 432 F. Supp. 3d 421, 430-431 (S.D.N.Y. 2020). The Court also finds that Defendant's recidivism is unlikely because her health conditions and risk of infection during the pandemic will limit her mobility and ability to interact with others. Dangerousness is further mitigated by the fact that the Court will release Defendant to home incarceration for the remainder of the time she was to be incarcerated, followed by the previously ordered 3 year period of supervised release, which will allow her to

---

[10] If the Second Circuit remands the case for the Court to determine this motion, the Court will first need more information from Defendant about the individual who will be assisting her obtain an apartment and where those initial rent-related funds will be coming from; which short-term residence she will initially be residing at and who will be residing with her there, so that United States Probation may ensure that the residence is appropriate; and an address for her long-term residence and who will be residing with her there, so that United States Probation may ensure that the residence is appropriate.

pursue treatment for her medical conditions as well as mental health and substance abuse treatment, and minimize her heightened exposure to serious complications or a risk of death from COVID-19.  For these reasons, the Court finds that Defendant's release will not present a danger to the safety of any other person or the community.

## CONCLUSION

For the foregoing reasons, Defendant's motion for bail pending appeal (Dkt. No. 423) is DENIED, but her second/ renewed motion for compassionate release (Dkt. No. 423) is GRANTED in the event the Second Circuit remands the case for that purpose, and Defendant shall be released from the custody of the United States Marshals Service to serve a period of home incarceration for the remaining term of imprisonment followed by the previously imposed term of supervised release.  Should the Second Circuit remand the case, the Court will issue a separate order setting forth the details of Defendant's period of home incarceration and her release from custody.  In the event the case is remanded for this purpose, the Court's Decision is stayed until Defendant submits a concrete plan for her release, as detailed at footnote 10 of this Decision, and the United States Probation Office has verified that her residence is appropriate.

**IT IS SO ORDERED.**

    *s/Richard J. Arcara*
    HONORABLE RICHARD J. ARCARA
    UNITED STATES DISTRICT COURT

Dated:  March 1, 2021
       Buffalo, New York